## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tony P. Trimble, Trustee of the Tony P.
Trimble Revocable Trust Agreement dated
September 4, 1998,

Civil Action No: _____

               Plaintiff,

vs.

Wealth Management, LLC; James Putman;
and Simone Fevola,

               Defendants.

## COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff Tony P. Trimble, Trustee of the Tony P. Trimble Revocable Trust Agreement dated September 4, 1998 ("Trustee") brings this civil action against defendants Wealth Management, LLC ("WM"), a registered investment advisor located in Appleton, Wisconsin; James Putman ("Putman"), WM's founder, majority owner and Chief Executive Officer; and Simone Fevola ("Fevola"), WM's former President and Chief Investment Officer (WM, Putman and Fevola may be referred to collectively herein as "Defendants"), and alleges as Trustee's complaint against Defendants as follows:

## SUMMARY OF ALLEGATIONS

1.    This case involves securities fraud and fraudulent representations by Defendants and the reasonable reliance thereon and harm suffered by Trustee as a result.

2.    Defendant WM is a financial planning firm for families and individuals and also serves as a Managing Member for WM's Gryphon Fund ("Gryphon").

3.   Defendant Putman is WM's founder, majority owner and Chief Executive Officer.

4.   Defendant Fevola is WM's former President and Chief Investment Officer.

5.   Trustee is one of WM's clients, having made two (2) separate investments in Gryphon based on the representations and warranties of Defendants.

6.   Defendants have breached their fiduciary duties to Trustee and engaged in fraud to Trustee's financial detriment by misrepresenting the safety and stability of Gryphon and by inducing Trustee to *twice* invest in Gryphon, even though such investment was unsuitable for Trustee and was based on fraudulent representations that were knowingly false or made with reckless disregard for the truth and/or omissions of Defendants.

7.   Through the activities alleged in this Complaint, Defendants, have engaged in transactions, acts, practices or courses of business which constitute a violation of Section 10(b) of the Securities Exchange Act of 1934, as amended ("Exchange Act") (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder at 17 C.F.R. § 9240.10b-5.

8.   Trustee brings this action under 15 U.S.C. § 78j(b) for recovery of monetary damages (inclusive of all investment amounts and Advisory Fees) incurred as a direct and proximate result of Defendants' fraudulent activities in violation of federal law, including without limitation disgorgement of ill-gotten gains, prejudgment interest, attorney fees and any other damages permissible under applicable law, including without limitation the equitable remedy of rescission.

9.   On information and belief, Gryphon appears to have limited remaining

assets. Trustee also understands that it appears likely that the values of Gryphon and nature of Gryphon's investment activities as reported by Defendants to induce Trustee to *twice* invest in Gryphon were knowingly or recklessly substantially overstated to Trustee, causing pecuniary damage to Trustee in the amount of Seven Hundred Thousand and No/100 Dollars ($700,000.00).

10.  Defendants have received management advisory fees paid by Trustee in excess of Eleven Thousand and No/100 Dollars ($11,000.00) ("Advisory Fees") based in part on these likely overvalued assets. On information and belief, WM is compensated for managing Gryphon through the Advisory Fees, and Putman and Fevola were key individuals involved in managing WM's investments.

11.  On information and belief, in 2006 and 2007, Putman and Fevola engaged in a kickback scheme through which each accepted at least $1.24 million in undisclosed payments derived from certain investments made in whole or in part by Gryphon funds while continuing to cause clients, including Trustee, to invest in Gryphon and while accepting Advisory Fees from Trustee.

12.  On information and belief, Defendants have been providing redemptions to Gryphon investors other than Trustee based on likely overstated valuations and have indicated to Trustee that they intend to continue to honor the redemption requests of certain investors as a priority over other investors in the context of an announced liquidation of Gryphon. However, on several occasions when Trustee discussed potential redemptions with Putman, Trustee was informed by Putman that Trustee did not need to redeem Trustee's interests in Gryphon because Gryphon was financially stable and

everything was "going fine", thereby inducing Trustee to choose not to redeem any of Trustee's interests.   Defendants further did not disclose to Trustee the extent of redemptions effected or requested from time to time.  Had Trustee redeemed all or a portion of Trustee's interests, Trustee may have been able to recoup all or a portion of Trustee's investments in Gryphon; however, as part of an ongoing pattern of fraud and deception, Defendants induced Trustee to retain Trustee's investment in Gryphon, causing Trustee to likely lose Trustee's entire investment.

## JURISDICTION

13.   This Court has subject matter jurisdiction over the this action pursuant to 28 U.S.C. § 1331 and Section 10(b) of the Securities and Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder at 17 C.F.R. § 240.10b-5.  Defendants, singly or in concert, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  These transactions, acts, practices and courses of business occurred in the District of Minnesota, where Trustee resides and where each of the Defendants transacted business during the relevant period.

14.   This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.   Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391 because a substantial amount of the events giving rise to the claim occurred in the District

and the Defendants are subject to personal jurisdiction in the State of Minnesota. Trustee is a resident of the State of Minnesota, and Defendants have engaged in substantial acts in furtherance of the alleged fraud and/or its effects within the State of Minnesota. Multiple misrepresentations by Defendants were made to Trustee while in Minnesota, those misrepresentations induced reliance by Trustee in Minnesota, the money for Trustee's investment in Gryphon (as described herein) originated in Minnesota, and Trustee's damages were sustained in Minnesota.

## DEFENDANTS

16.   Wealth Management, LLC is a Wisconsin limited liability company located in Appleton, Wisconsin. It has been registered with the United States Securities and Exchange Commission (hereinafter, "SEC") as an investment advisor since August 1997. WM was founded by Putman in 1985, and Putman currently owns 60% of the firm. WM is the investment advisor to six unregistered investment pools (including Gryphon) and serves as the General Partner or Managing Member of these private funds (including Gryphon).

17.   James Putman resides in Menasha, Wisconsin. Putman is the founder, Chief Executive Officer, and Chairman of the Board of Managers of WM.

18.   Simone Fevola resides in Appleton, Wisconsin. Fevola served as WM's President and Chief Investment Officer from September 2002 through October 2008, when he resigned.

## STATEMENT OF FACTS

19.   WM is a registered investment advisor serving families and individuals.

20. Putman founded WM in 1985, has been its majority owner at all relevant times, and currently owns approximately sixty percent (60%) of WM. Fevola served as WM's President and Chief Investment Officer from September 2002 through October 2008. Accordingly, at all times relevant to the allegations herein, Putman and/or Fevola exercised general control over the operations of WM and Gryphon and possessed the power or ability to control the specific transaction or activities of WM and Gryphon.

**Trustee's Investment Objectives**

21. On October 27, 2006, Trustee prepared and delivered to WM that particular WML Gryphon Fund, LLC Subscription Agreement Confidentiality Questionnaire (the "Questionnaire"), inclusive of a "Risk Assessment" questionnaire at Schedule B thereto, a true and correct copy of which Questionnaire is attached hereto as *Exhibit A*. In this Questionnaire, Trustee represented to WM that he had "occasional" investment experience in real estate, marketable securities and similar investments (page 6). On Schedule B to the Questionnaire (also dated October 26, 2007)("Schedule B"), Trustee represented to WM that Trustee's desire investment objective was "Asset growth, while accepting a moderate degree of volatility". Trustee represented that he ideally expected "10% or more" returns on long-term investments and that he had an "average" level of knowledge and/or understanding of investment markets.

22. On October 26, 2007, contemporaneous with the Questionnaire, WM and Trustee executed a Discretionary Investment Management Agreement ("Investment Management Agreement") with Trustee, which Investment Management Agreement gave WM full discretion to make investment decisions within the parameters of Trustee's

conservative investment strategies as represented within Schedule B to the Questionnaire. WM charged Trustee an Advisory Fee for its investment management services in the amount of one percent (1%) of the investment value as determined or reported by WM. In total, Trustee has paid Advisory Fees to WM in excess of Eleven Thousand and No/100 Dollars ($11,000.00).

23. Contemporaneous with delivery of the Investment Management Agreement and Questionnaire, Defendants provided Trustee with a one (1) page summary statement relative to WML Gryphon Fund LLC, a true and correct copy of which is attached hereto as *Exhibit B* (the "Summary Statement"). The Summary Statement represented that Gryphon's year to date return rate (thought August 2006) was 10.68%, with a 41.96% growth rate since inception in May 2003.

24. The Summary Statement provided a "Risk/Return Analysis" comparing Gryphon's "Annualized Return" to the Merrill Lynch Domestic Master Fund ("ML Domestic Master") and three (3) month United States Treasury bills ("3-Month T-Bill"). The Annualized Return for Gryphon, represented by a square, was between 10% and 12%, while the Annualized Return for ML Domestic Master (represented by a diamond) and 3-Month T-Bill (represented by a triangle) was between 2% and 4%.

25. Additionally, the Summary Statement contained a line graph which compared return rates from May 2003 through August 2006 for each of Gryphon, ML Domestic Master and 3-Month T-Bills which showed Gryphon steadily increasing each and every month while both ML Domestic Master and 3-Month T-Bills remaining relatively flat in terms of growth.

26.   In addition to the Summary Statement, Defendants provided to Trustee a one (1) page Portfolio Allocation statement dated September 1, 2006, which indicated that 24.9% of Gryphon's assets were invested in MKA (identified as "real estate finance") (MKA is described in greater detail below), 31.0% were invested in two (2) "pending" assets (Range Tree and UTC) each identified as a "Life Insurance Finance 12% Note" and an additional 3.8% and 13.6% in "Range Tree" and "UTC", respectively, described as "Life Insurance Premium Finance".

27.   On or about October 26, 2006, Trustee invested the amount of Five Hundred Thousand Dollars ($500,000.00) in Gryphon (the "Initial Investment"). Trustee made the Initial Investment in reliance on Defendants' representations that they would heed Trustee's desired investment objectives (namely, that Trustee's investment objectives were conservative and intended for long-term asset growth, with moderate to low risk).

28.   To induce Trustee to make the Initial Investment, Trustee was repeatedly orally informed by Putman that Gryphon was financially sound, provided stable returns unavailable in the stock market and would yield 7%-8% annual returns with moderate risk. These representations were corroborated by the Summary Statement and Portfolio Allocation documents described hereinabove.

29.   In reasonable reliance upon such representations, and in reliance on Trustee's understanding that Defendants would honor Trustee's stated moderate risk investment objectives, Trustee made the Initial Investment without any knowledge or reason to believe that such representations were false, inaccurate or misleading. Had Trustee known that such representations were false, inaccurate or misleading at the time of the

Initial Investment, or that Defendants would place all or substantially all of Trustee's investment in risky and illiquid schemes (as described below) Trustee would not have made the Initial Investment.

30. To further induce Trustee to make the Initial Investment, Putman advised Trustee that, although the required minimum investment in Gryphon was One Million and No/100 Dollars ($1,000,000.00), WM would permit Trustee to invest less than that minimum threshold amount. On information and belief, despite these representations by Putman, numerous investors in Gryphon invested amounts substantially less than One Million and No/100 Dollars ($1,000,000.00) and numerous such investors were unsophisticated investors and/or investors requiring rapid return on their investment. Had Trustee known of the true nature and character of the investors in Gryphon, Trustee would not have made the Initial Investment.

31. In oral conversations with Putman prior to making the Initial Investment (and on other occasions thereafter), Trustee orally represented to Putman that Trustee was about to commence construction on a new home and that Trustee would likely require access to principal and/or income from Trustee's investment in Gryphon to fund such construction. As described in greater detail below, at no time did Putman or any other representative or employee of Defendants inform Trustee of the true financial status of Gryphon or that Gryphon would likely be unable to honor such redemptions. Had Trustee known such information, Trustee would not have made the Initial Investment.

32. On January 17, 2007, Trustee prepared and executed an amended Schedule B Risk Assessment (based on a form revised by WM on December 11, 2006), in which

Trustee represented to WM that Trustee's desired investment objective was "principal preservation, with some opportunity for growth". A true and correct copy of this amended Schedule B is attached hereto as *Exhibit C*.

33. In regular reports to Trustee after the Initial Investment, WM has reported generally positive returns for Gryphon, in some cases remarkably consistent returns, but, on information and belief, these purported returns have been based almost entirely on the values reported by third-party managers of Gryphon's investments in risky, illiquid ventures, as discussed below. For example, according to WM, as of April 14, 2009, Gryphon had approximately $38 million in assets; however, on information and belief, Defendants have not performed any independent due diligence on, or verification of, these values.

34. Defendants have caused Gryphon to make a wide variety of risky, illiquid, "alternative" investments including: life insurance premium financing funds accounting for almost seventy percent (70%) of the purported fair market value of the entire fund and not previously disclosed to Trustee; a water theme park; an oil drilling and production company; and real estate funds which provide financing for single family home developers in the southwest U.S and another of Defendants' funds comprised of similar investments. On information and belief, most of these investments are in other funds which are managed by third-party managers, as Gryphon has generally been operating as a "fund of funds".

35. Such investments are wholly inconsistent with the conservative stated investment objectives and investment strategy of Trustee (and purportedly Gryphon, as

represented by Defendants). On information and belief, at present, almost seventy percent (70%) of Gryphon's purported value is in risky and illiquid life-insurance related investments, in contrast to Defendants' false representations that Trustee's investments would be safe and stable as conservative fixed-income investments in keeping with the stated investment objectives and investment strategy.

36.   Since the Initial Investment, Gryphon provided monthly reports to Trustee, prepared and/or reviewed by Defendants, in which Gryphon used for comparative purposes as performance benchmarks the Merrill Lynch Domestic Master Bond Index, which was an index of U.S. Treasury, agency, corporate, and other bonds; as well as the 3-Month U.S. Treasury Bill. These comparisons were similar to the one (1) page Summary Statement initially provided to Trustee by Defendants prior to Trustee's making of the Initial Investment. On information and belief, in these monthly reports, Defendants and Gryphon knowingly or recklessly falsely represented that, since inception, Gryphon had significantly outperformed these fixed-income benchmarks while exhibiting relatively low volatility.

37.   The monthly reports depicting Gryphon's investments as higher performing, and in some cases less volatile, than performance benchmarks such as the Merrill Lynch Domestic Master Bond Index were provided by Defendants despite Defendants' knowledge of their falsity or reckless disregard for their truthfulness, since there has been no established trading market for any of these alternative investments, and all representations about price and volatility were based exclusively on the representations made by third-party fund managers.

**Supplemental Investment**

38.   After receiving such monthly reports, and in reliance on such monthly reports, on May 10, 2007 Trustee invested an additional Two Hundred Thousand and No/100 Dollars ($200,000.00) in Gryphon (the "Supplemental Investment").

39.   At no time prior to Trustee's making such Supplemental Investment did Defendants indicate to Trustee the true nature of Gryphon's investments, the true financial condition of Gryphon or that Defendants would not continue to follow Trustee's stated investment objectives and investment strategies.   Further, at no time prior to Trustee's making such Supplemental Investment did Defendants provide or even attempt to provide Trustee with accurate or truthful information as to Gryphon's actual financial condition and investment schemes.

40.   In addition, Putman personally orally misled Trustee about the risks of an additional investment in Gryphon, letting Trustee believe at the time of the Supplemental Investment that Gryphon provided stable returns unavailable in the stock market and would yield 7%-8% annual returns with virtually no risk.   At no time prior to or upon Trustee's making such Supplemental Investment did Putman ever indicate that Putman's 7%-8% annual return representations or that representations of returns of 8%-10% within documentation provided by Defendants to Trustee at the time of the Initial Investment were false or inaccurate.

41.   At no time prior to Trustee's Initial Investment or the Supplemental Investment did Defendants provide to Trustee a private placement offering memorandum or similar document.   Moreover, at no time from Trustee's Initial Investment to the

Supplemental Investment to various redemption discussions (described in greater detail below) did Defendants ever provide to Trustee any offering documents relative to Gryphon's investment activities.

42.  In reliance on Gryphon's misrepresentations, including falsely characterized monthly financial reports and omissions of material and truthful information as to Gryphon's true financial condition and investment schemes, Trustee made the Supplemental Investment.

43.  Had Trustee known the true financial condition of Gryphon and/or that Defendants' representations were untrue at the time of the Supplemental Investment, Trustee would not have made the Supplemental Investment.

**Fund Redemptions**

44.  On February 18, 2008, Trustee submitted a written request to Defendants seeking a full and complete redemption of Trustee's investment in Gryphon.  After such submission request, Trustee was induced by Defendants or their representatives to withdraw such redemption request on March 31, 2008, being orally informed by Defendants or their representatives that Gryphon's financial condition was sound and that redemption was not necessary because Trustee's investment was not at risk.

45.  Subsequent to March 31, 2008, Trustee on several occasions again requested a full redemption, which redemption requests Trustee again withdrew after again being orally informed by Defendants or their representatives that Gryphon's financial condition was sound and that redemption was not necessary because Trustee's investment was not at risk.  In correspondence dated May 14, 2009 a true and correct copy of which is

attached hereto as *Exhibit D*, Trustee described these redemption requests to WM and Putman and stated that, had Trustee been aware of all material information, Trustee would not have withdrawn the full redemption requests.

46.   Specifically, Trustee was orally advised by Putman and/or Putman's representatives (including Chad Morley) in each of March, June and September 2008 that no difficulties existed with respect to Gryphon other than the MKA real estate investment and that all other matters with respect to Gryphon were in good order.

47.   At no time during these redemption discussions did Defendants or their representatives disclose that nearly seventy percent (70%) of Gryphon's assets were held in highly risky and illiquid life insurance premium assets, an amount substantially and significantly greater than Trustee's stated risk parameters and investment strategies known to Defendants at the time Defendants accepted the Initial Investment and Supplemental Investment from Trustee.

48.   At no time during these redemption discussions did Defendants or their representatives disclose to Trustee the extent of redemptions effected or requested from time to time by other investors in Gryphon.

49.   In February 2008, WM provided written notification to investors in Gryphon that, pursuant to Gryphon's governing documents, WM was temporarily limiting redemptions in Gryphon to two percent (2%) per quarter of the value of each individual's investment, purportedly due to liquidity issues.   At this same time, Defendants were, through fraudulent representations, inducing Trustee to withdraw or forego full redemption requests.

50.   On May 20, 2009, the SEC filed a Complaint ("SEC Complaint") in issued the United States District Court, Eastern District of Wisconsin, Green Bay Division, against numerous defendants associated with Defendants (including WM, Putman, Fevola and Gryphon) alleging numerous acts of securities fraud by Defendants against investors in numerous funds (including Gryphon) controlled by and/or associated with Defendants. A true and correct copy of the SEC Complaint is attached hereto as *Exhibit E*. The SEC Complaint alleges at ¶ 77 that, notwithstanding WM's limitation of redemptions to two percent (2%) per quarter, some investors requested full redemptions from the fourth quarter of 2007 through the third quarter of 2008, and WM accepted these full redemption requests and promised to satisfy them as money became available. During this same time period, Defendants induced Trustee to withdraw or forego full redemption requests, through false representations as to Gryphon's financial condition.

51.   Until the SEC Complaint, Trustee was not aware that other investors had been promised full redemptions. Upon information and belief, approximately twenty-five percent (25%) of the investors comprising the purported value of Gryphon have been granted or requested full redemptions. Again, as stated above, at no time did Defendants or their representatives disclose to Trustee the extent of redemptions effected or requested from time to time by other investors. Had Trustee known of such promises to other investors, and/or had Trustee known of Gryphon's true financial condition and asset composition at the time, Trustee would not have withdrawn the full redemption requests.

52.   By Defendants' fraudulently inducing Trustee to withdraw the full redemption requests through these false representations, Trustee was denied the ability to

participate in full redemptions granted (or at least promised) to other investors in Gryphon, which redemptions may have enabled Trustee to recoup all or a substantial portion of Trustee's investment in Gryphon.

53.  In making the Initial Investment and Supplemental Investment, Trustee entrusted Defendants with significant liquid assets in the amount of Seven Hundred Thousand and No/100 Dollars ($700,000.00), and Defendants betrayed that trust by investing Trustee's assets in Gryphon (and its underlying illiquid and risky investments). Such investment decisions were in direct breach of Trustee's stated investment desires and strategies and placed all of Trustee's investment with Defendants at substantial risk without Trustee's knowledge or consent.

54.  At all times in connection with their representations to Trustee, Defendants knew that their above representations concerning the safety, stability, liquidity and suitability of Gryphon were false, inaccurate and/or misleading or acted with reckless disregard for their truthfulness.

**Kickbacks**

55.  On information and belief, the largest of Gryphon's "alternative investments" are two funds which provide life insurance premium financing, The Brown Investment Fund, L.P. ("Brown") and The Baetis Fund, L.P. ("Baetis").

56.  Trustee has recently learned that Gryphon has either been the sole investor or the majority investor in Brown and Baetis. These funds have comprised a significant part of the reported investment value of Gryphon at all times Trustee's assets have been invested with Defendants (including the Initial Investment and the Supplemental

Investment).

57.   Defendants understood, but at no time disclosed to Trustee (including at the time of the Initial Investment, Supplemental Investment and/or in connection with discussions regarding Trustee's repeated redemption requests), during the majority of the time that Gryphon assets were invested in Brown and Baetis (including at the time Trustee made the Initial Investment and Supplemental Investment), that Brown's and Baetis' primary business involved making loans to elderly individuals who used the proceeds to pay life insurance premiums for the first two (2) years of their insurance policies. In connection with each loan, an "ILIT" – irrevocable life insurance trust – was created. The ILIT's asset consisted of the life insurance policy, and the beneficiaries of the ILIT include the insured, the insurance agent, and the lender, which was either Brown or Baetis.

58.   On information and belief, Defendants, at the time of investing Gryphon's assets in Brown and Baetis, understood that the financing of these policies was supposed to generate a return in one of three ways: (1) the insured buys the policy from the ILIT after two years, assumes the premium payments, and repays the loan to Brown or Baetis with interest ranging from 8% to 15%; (2) the ILIT sells the policies in the life settlement market after two years and the ILIT's beneficiaries share in the profits; or (3) the beneficiaries of the ILIT receive death benefits if the insured passes away during the two-year period. At no time (including at the time of the Initial Investment, Supplemental Investment and/or in connection with discussions regarding Trustee's repeated redemption requests) did Defendants disclose such information to Trustee.

59. On information and belief, Defendants also understood at the time of investing Gryphon's assets in Brown and Baetis, that this investment strategy of financing individual life insurance policies carried with it a number of significant risks, such as the possibility that there would be no market for the policies when ILIT tried to sell them, or that the policyholder and/or Brown or Baetis would fail to pay the policy's required premiums during the first two year policy, which could cause the insurance company to cancel the policy and cause a total loss of principal. At no time (including at the time of the Initial Investment, Supplemental Investment and/or in connection with discussions regarding Trustee's repeated redemption requests) did Defendants disclose such information to Trustee.

60. On information and belief, Defendants also knew that, in connection with investing Gryphon's assets in Brown and Baetis, these funds' investment strategy to finance individual loans resulted in greatly illiquid investments and much greater volatility as compared to investment grade debt securities. At no time (including at the time of the Initial Investment, Supplemental Investment and/or in connection with discussions regarding Trustee's repeated redemption requests) did Defendants disclose such information to Trustee.

61. At times relevant to the allegations in this Complaint, Brown and Baetis have been, and continue to be, managed by an unregistered investment advisor, Wood, Hat, & Silver ("WHS"). On information and belief, WHS' principal, Joseph Aaron ("Aaron"), was sued by the SEC in 1996 in an enforcement action alleging that Aaron committed fraud in selling promissory notes to investors. As part of the consent judgment in that

lawsuit, Aaron was enjoined from violations of the anti-fraud provisions of the federal securities laws, ordered to pay a $20,000 civil penalty, and suspended for twelve months from association with any broker, dealer, municipal securities dealer, investment company or investment advisor. The permanent injunction against Aaron automatically resulted in a permanent investment company bar under Section 9(a) of the Investment Act of 1940.

62. On information and belief, Defendants knew about Aaron's disciplinary history as early as 2003 and 2004. Despite the obvious concerns raised by Aaron's disciplinary history, Defendants nonetheless invested substantial portions of Gryphon's assets (including Trustee's Initial Investment and/or Supplemental Investment) in Brown and Baetis, allowed Aaron to value Gryphon's investments in Brown and Baetis and did not perform any independent verification of these valuations. At no time (including at the time of the Initial Investment, Supplemental Investment and/or in connection with discussions regarding Trustee's repeated redemption requests) did Defendants disclose Aaron's disciplinary history to Trustee at any time (whether prior to or upon Trustee's making of the Initial Investment *or* the Supplemental Investment).

63. On information and belief, in 2006 and 2007, Putman and Fevola each took $1.24 million in undisclosed kickbacks derived in whole or in part from Gryphon investments in Brown and Baetis. During the period in which Putman and Fevola were receiving their undisclosed kickbacks, and thereafter, Defendants continued to recommend Gryphon to WM's advisory clients, including Trustee, continued to place WM advisory client funds (including Trustee's funds) into Gryphon, and continued to

cause additional investment by Gryphon into Brown and Baetis, through which they derived their kickback payments.

64. At no time at the time of the Initial Investment, Supplemental Investment and/or in connection with discussions regarding Trustee's repeated redemption requests did Putman or Fevola disclose the receipt of these commissions or the inherent conflict of interest to Trustee during their perpetration of the kickback scheme.

65. Putman has recently represented to Trustee (in telephone conversations between Trustee and Putman in May 2009) that Putman invested all of Putman's proceeds from such kickbacks in other investments held by Putman and that Putman was ready, willing and able to remit the same to investors and "the SEC". Such representations amount to tacit admissions of such kickbacks, which have only been recently admitted by Putman to Trustee, but which were never disclosed by Putman to Trustee until such very recent telephone conversations.

66. Had Trustee been aware of the kickback scheme at the time of the Initial Investment and/or Supplemental Investment, Trustee would not have made either investment.

**Current Value of Gryphon**

67. Upon request of the SEC pursuant to the SEC Complaint, Defendants' assets have been frozen and are subject to a receiver, pursuant to that particular First Modified Order Appointing Receiver dated May 26, 2009. A true and correct copy of this Order is attached hereto as *Exhibit F*.

68. Gryphon appears to have limited remaining assets, because Gryphon's largest

investments appear to have limited or questionable value.   Paragraph 13 of the SEC Complaint alleges: "[Defendants' funds, including Gryphon] appear to have limited remaining assets.   It also appears likely that the reported values of the Funds are substantially overstated."   On information and belief, these values have been fraudulently overstated by Defendants to Trustee in monthly reports since the Initial Investment.

69.   Moreover, on information and belief (including allegations with the SEC Complaint), several of Gryphon's largest investments are now in bankruptcy.   The first two bankrupt investments are in two real estate funds managed by MKA Advisors ("MKA"), a California investment manager.   These real estate funds were apparently forced into bankruptcy in April 2009, WM has apparently written off the value of Gryphon's investment in one of these two funds significantly.   Although WM continues to reflect that Gryphon's investment in the other MKA fund has retained most of its value, this valuation was performed prior to this fund's bankruptcy.   At the time Trustee made the Initial Investment, Defendants represented that MKA constituted twenty-four point nine percent (24.9%) of Gryphon's holdings.

70.   The SEC Complaint indicates that the other bankrupt investment is in Sagecrest II, LLC ("Sagecrest II"), a Connecticut short-term asset-based lending fund. Sagecrest II filed for bankruptcy in the summer of 2008.   Apparently, in December 2008, WM wrote down the value of the Funds' investments in Sagecrest II by approximately fifty percent (50%).   At the time Trustee made the Initial Investment, Defendants represented that Sagecrest II constituted two point one percent (2.1%) of Gryphon's holdings.

71.   As indicated above, almost seventy percent (70%) of Gryphon's current purported value resides in investments in Brown and Baetis, the value of which is entirely questionable.  The SEC Complaint alleges that notes to Gryphon's audited 2006 financial representations, which were only recently completed in January 2009, disclose that amounts owed on promissory notes comprise most of the purported value of Baetis. However, according to these financial statements, many of the promissory notes have matured and have not been prepaid or sold as of November 2008.  Similarly, Brown's 2008 audited financial statements, which were completed in March 2009, disclose that from December 2008 through March 2009, several of the life insurance policies that secure the promissory notes invested in by Brown lapsed.  These lapses, resulting from policyholders' failure to pay premiums, caused Brown to completely write off the value of those promissory notes.  The financial statements also state that if this trend of lapses continues, Brown "will recognize significant bad debt expense on worthless promissory notes receivables in 2009."

72.   Further, the SEC Complaint alleges that, in May 2008, WHS and Aaron told WM that Brown and Baetis could not satisfy redemption requests by WM because of the downturn in the real estate market.  Aaron, who runs Brown and Baetis, has previously been sued by the SEC for fraud, which casts doubt on the integrity of the valuations he has been providing to WM.  This information was not disclosed to Trustee by Defendants during any of the redemption discussions that occurred after 2008 between Trustee and Defendants.

73.   The SEC Complaint alleges that, starting in December 2008, the value of

Brown and Baetis reported by WHS and Aaron has declined, but WM and Putman have continued to rely exclusively on periodic, one (1) page account statements received from Brown and Baetis, despite the evidence that those investments' values have greatly deteriorated.

74.   The SEC Complaint alleges that Putman recently admitted to one investor that the realizable value of Gryphon's investment in Baetis – which comprised 70% of Gryphon's assets as of December 31, 2008 – "could be as high as 80% and as low as 0% depending on the markets." According to this investor, Putman has told him that his entire investment in Gryphon – which according to WM's and Gryphon's account statements to the investor is over $1 million – could be worthless.

75.   Putman has orally represented to Trustee that the value of Gryphon is "uncertain".

76.   As indicated above, in February 2008, WM notified its investors that WM was temporarily limiting redemptions in Gryphon to two percent (2%) per quarter of the value of each individual's investment, purportedly due to liquidity issues, while at the same time promising full redemptions to certain other investors on a preferential basis. In December 2008, WM provided written notification of its decision to liquidate Gryphon and completely suspend redemptions. WM stated that for investors who had not yet submitted requests, future distributions would be made on a *pro rata* basis based on WM's December 31, 2008 valuation of Gryphon. WM stated that investors whose withdrawal requests were accepted before September 30, 2008 would be treated as unsecured creditors who would be paid in full before other investors would be paid at all.

On information and belief, over Eight Million Dollars ($8,000,000.00) worth of such full redemptions are yet payable by WM.

77.   All of these facts suggest that Defendants have overstated and are continuing to overstate the values of Gryphon.

78.   Based on the foregoing, Trustee's Initial Investment and Supplement Investment, along with all of Gryphon, is likely valueless, and Trustee has likely lost the entire Seven Hundred Thousand and No/100 Dollars ($700,000.00) Trustee invested in Gryphon, plus Advisory Fees in excess of Eleven Thousand and No/100 Dollars ($11,000.00.

## COUNT I

### 15 U.S.C. § 78j AND 17 C.F.R. § 240.10b-5

79.   Trustee realleges and incorporates by reference each and every allegation set forth above.

80.   By virtue of the conduct alleged herein, Defendants, singly or in concert with others, by use of the means or instrumentality of interstate commerce, or by the use of mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or with reckless disregard for the truth made untrue representations of material fact to Trustee and/or and omitted to state material facts to Trustee necessary in order to make representations made, in the light of the circumstances under which they were made, not misleading, all in order to induce Trustee to invest an aggregate of Seven Hundred Thousand and No/100 Dollars ($700,000.00) in Gryphon pursuant to the Initial Investment and Supplemental Investment, as well as to

pay to Defendants ongoing Advisory Fees in excess of Eleven Thousand and No/100 Dollars ($11,000.00).

81.  By reason of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.  Trustee justifiably relied upon the false and misleading representations and/or omissions of Defendants in connection with the Initial Investment and the Supplemental Investment.

83.  If not for such false and misleading representations and/or omissions of Defendants, Trustee would not have made either the Initial Investment or the Supplemental Investment.

84.  Trustee has likely suffered a complete loss of Trustee's entire investment amount of Seven Hundred Thousand and No/100 Dollars ($700,000.00), and paid over Eleven Thousand Dollars ($11,000) in Advisory Fees based on false valuations, as a direct and proximate result of Defendants' false and misleading representations and/or omissions.

## COUNT II

### FRAUDULENT INDUCEMENT

85.  Trustee realleges and incorporates by reference each and every allegation set forth above.

86.  As described more fully above, Defendants have made untrue representations of material fact to Trustee and/or and omitted to state material facts to Trustee necessary in order to make representations made, in the light of the circumstances under which they

were made, not misleading, all in order to induce Trustee to make the Initial Investment and the Supplemental Investment in Gryphon.  At the time these representations and/or omissions were made/omitted (as applicable), Defendants either knew of their falsity or acted with reckless disregard as to their truth or falsity.

87.  Trustee reasonably relied on these representations and/or omissions to Trustee's detriment in making the Initial Investment and the Supplemental Investment in Gryphon.

88.  Trustee would not have made the Initial Investment and the Supplemental Investment in Gryphon without such false representations and/or omissions; Trustee would have simply refused to purchase any securities in Gryphon or any other fund of WM.

89.  These fraudulent misrepresentations directly induced Trustee to make the Initial Investment and the Supplemental Investment in Gryphon and pay the Advisory Fees.  Accordingly, Trustee has been damaged in an amount to be proven at trial, but in excess of Seven Hundred Eleven Thousand and No/100 Dollars ($711,000.00), plus interest, costs and attorney fees.

## COUNT III

### MINNESOTA SECURITIES ACT, § 80A.68

90.  Trustee realleges and incorporates by reference each and every allegation set forth above.

91.  Defendants' conduct involved the purchase and sale of security under Minnesota Statutes Chapter 80A.

92. As detailed above, Defendants made untrue representations of material fact to Trustee and/or and omitted to state material facts to Trustee necessary in order to make representations made, in the light of the circumstances under which they were made, not misleading.

93. As a result of Defendants' conduct, Trustee has suffered actual damages in an amount to be proven at trial, but in excess of Seven Hundred Eleven Thousand and No/100 Dollars ($711,000.00), plus interest, costs and attorney fees.

## COUNT IV

### UNJUST ENRICHMENT

94. Trustee realleges and incorporates by reference each and every allegation set forth above.

95. Trustee paid to Defendants the amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) for the Initial Investment, Two Hundred Thousand and No/100 Dollars ($200,000.00) for the Supplemental Investment and in excess of Eleven Thousand and No/100 Dollars ($11,000.00) as and for Advisory Fees, based on Defendants' representations that such monies would be utilized by Defendants in accordance with Trustee's conservative and low-risk investment desires and strategies.

96. Defendants failed to invest Trustee's funds in a manner consistent with Trustee's stated wishes and desires, to Trustee's detriment.

97. If allowed to keep the monies paid by Trustee to Defendants, Defendants will be unjustly enriched in an amount to be proven at trial, but in excess of Seven Hundred Eleven Thousand and No/100 Dollars ($711,000.00), plus interest, costs and attorney

fees.

## COUNT V

### CONVERSION

98. Trustee realleges and incorporates by reference each and every allegation set forth above.

99. In reliance on Defendants' representations and/or omissions, Trustee made a decision to pay to Defendants the aggregate amount of Seven Hundred Eleven Thousand and No/100 Dollars ($711,000.00).

100. Defendants, through their intentional fraudulent acts, have wrongfully converted Trustee's funds for their own benefit to the detriment of Trustee.

101. Trustee never had knowledge of, nor did Trustee ever consent to, such conversion.

102. As a result of Defendants' conduct, Trustee has suffered actual damages in an amount to be proven at trial, but in excess of Seven Hundred Eleven Thousand and No/100 Dollars ($711,000.00), plus interest, costs and attorney fees.

## COUNT VI

### RESCISSION

103. Trustee realleges and incorporates by reference each and every allegation set forth above.

104. As described more fully above, Defendants have made false representations of material fact and omissions of material fact knowing such representations/omissions to be false or making such representations with reckless disregard for the truth.

105. Defendants had the intent to induce Trustee to rely on materially false representations/omissions in making the Initial Investment and Supplemental Investment ands paying the Advisory Fees, and Trustee did in fact rely on those representations.

106. As a result, Trustee was deceived by Defendants and pecuniarily damaged.

107. Trustee is therefore entitled to void the Initial Investment and the Supplemental Investment and is entitled to a return of Trustee's entire investment and Advisory Fees in an amount to be proven at trial, but in excess of Seven Hundred Eleven Thousand and No/100 Dollars ($711,000.00), plus interest, costs and attorney fees.

## COUNT VII

## ACCOUNTING

108. Trustee realleges and incorporates by reference each and every allegation set forth above.

109. To protect Trustee and enable Trustee to a return of Trustee's investment, it is necessary for Defendants to provide an accounting of all funds transferred from Gryphon since the Initial Investment sufficient for Trustee to determine the purpose and recipients of all such transfers.

## RELIEF REQUESTED

**WHEREFORE**, the Trustee prays that the Court enter a judgment in Trustee's favor and against the Defendants as follows:

1.     For all direct and consequential damages, including, without limitation, Trustee's Initial Investment amount of Five Hundred Thousand and No/100 Dollars ($500,000.00); Trustee's Supplemental Investment Issue amount of Two Hundred

Thousand and No/100 Dollars ($200,000.00); and Advisory Fees in excess of Eleven

Thousand and No/100 Dollars ($11,000.00);

2.      For attorneys' fees and costs;

3.      For the equitable remedy of rescission;

4.      For punitive damages as permitted under applicable law;

5.      For an additional award of prejudgment interest as permitted under

Minnesota law;

6.      For an accounting of the funds transferred from Gryphon; and

7.      For such other and further relief the Court deems just.

## DEMAND FOR A JURY TRIAL

Trustee demands a jury trial on all claims so triable.

**TRIMBLE & ASSOCIATES, LTD.**

Dated: June 8, 2009

Matthew W. Haapoja, #268033 (MN)
10201 Wayzata Blvd, Suite 130
Minnetonka, MN 55305
(952) 797-7477

*Attorneys for Trustee*